IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| JONATHAN GHERTLER, | : | CIVIL NO. 1:11-CV-2385 |
| | : | |
| Petitioner, | : | (Chief Judge Conner) |
| | : | |
| v. | : | |
| | : | (Magistrate Judge Carlson) |
| FEDERAL BUREAU OF PRISONS, | : | |
| | : | |
| Respondent. | : | |

# REPORT AND RECOMMENDATION

## I.   Introduction

In this habeas corpus petition,[1] the petitioner, Jonathan Ghertler, invites us to examine the results of a prison disciplinary hearing which took place in September of

---

[1] We note that this petition is the latest in a series of petitions and complaints filed by Ghertler which have over time sought different and shifting remedies, and invoked an array of procedural vehicles to seek extraordinary relief from the courts. Thus, Ghertler has at various times sought habeas corpus or coram nobis relief, as well as seeking to sue parties, alleging a variety of matters. See e.g.,Ghertler v. Ebbert, 1:11-CV-526, 2011 WL 2006367 (M.D. Pa. Apr. 25, 2011) report and recommendation adopted, 1:11-CV-526, 2011 WL 1989764 (M.D. Pa. May 23, 2011); Ghertler v. Ritter, CIV.A. 4:11-2387, 2012 WL 5463140 (M.D. Pa. Oct. 19, 2012) report and recommendation adopted as modified, 4:11-CV-2387, 2012 WL 5463682 (M.D. Pa. Nov. 8, 2012). Indeed, this latest action began as a coram nobis petition, was converted to a habeas corpus petition, and now seems to sound in mandamus according to Ghertler.

2006. With respect to this habeas corpus petition, the parties cast this dispute in terms which invite the Court to choose between one of two intuitively unappealing options.

For their part, the Respondents urge us to dismiss this petition as moot, and not address the merits of Ghertler's claims. The Respondent take this position because they must. The Respondents cannot defend the merits of this claim, having entirely lost the disciplinary records pertaining to this incident and having failed in efforts to reconstruct that record. Thus, with the disciplinary file have gone completely missing this matter cannot be defended, or reviewed, in any meaningful way. Indeed, it is undisputed that some prison officials have over the years recognized this fact and recommended that Ghertler's disciplinary citation be expunged. (See Doc. 51.)

In contrast, Ghertler urges us to reach the merits of this dispute, set aside his prison disciplinary citation, and presumably make favorable housing, transfer, and pre-release programing available to him, Ghertler invites us to adopt this course despite the fact that he has long ago completed the service of the sentence that was the subject of this disciplinary proceeding. Moreover, Ghertler protests the unfairness of this 2006 disciplinary citation for escape against a factual backdrop which, while murky, clearly indicates that Ghertler engaged in grave misconduct of some sort while at this halfway house, misconduct which took place near the conclusion of his last federal sentence, and misconduct which led to his current federal conviction and sentence.

Finally, the parties invite us to unconditionally embrace one of these two unattractive options in a setting where essential facts remain stubbornly ambiguous, an ambiguity which the Respondents are unable to clarify and which Ghertler has been unwilling to explain.

For the reasons set forth below, it is recommended that we decline to adopt either of the competing courses urged by the parties. Instead, we recommend that this Court grant Ghertler's petition, in part, solely to the extent that the Bureau of Prisons should do that which it has considered doing; namely, expunge this specific disciplinary citation since the Bureau of Prisons has completely lost this file and there is absolutely no evidence which the Bureau of Prisons can locate that would permit meaningful review of this disciplinary matter at this time. However, this limited relief should be granted in a fashion which makes it absolutely clear that the Bureau of Prisons can, should, and must consider and assess the circumstances surrounding Ghertler's disappearance, return to custody, and new federal conviction for offenses which apparently occurred while Ghertler was serving a prior federal sentence when making housing, programing and pre-release decisions for this inmate.

## II. <u>Statement of Facts and of the Case</u>

While some matters in this case remain shrouded in confusion and mystery, a great deal is now known with some precision.[2] On December 5, 2002, the Petitioner, Jonathan Ghertler, was sentenced by the United States District Court for the Southern District of New York to a 71-month term of imprisonment, followed by a three-year term of supervision, for wire fraud. This 2002 conviction was not Ghertler's first conviction for *crimen falsi*. Ghertler had other, prior convictions at the time of this federal prosecution. Three and one-half years later, on July 11, 2006, while serving this sentence at the Federal Correctional Institution in Yazoo City, Mississippi, Ghertler was transferred to a halfway house in the Orlando, Florida, Community Corrections Office.

In Orlando Florida something occurred which is still not fully explained by the parties. This much is known, however, with some certainty. On September 15, 2006, halfway house officials reported that Ghertler had escaped. Accordingly, on September 18, 2006, a disciplinary hearing was conducted *in absentia* for Ghertler on this infraction and he was found guilty of escaping from custody. Ghertler was

---

[2]This statement of undisputed facts in this matter is largely derived from Ghertler's prior habeas corpus petition, as supplemented by pleadings filed in the instant action. See e.g., <u>Ghertler v. Ebbert</u>, 1:11-CV-526, 2011 WL 2006367 (M.D. Pa. Apr. 25, 2011) <u>report and recommendation adopted,</u> 1:11-CV-526, 2011 WL 1989764 (M.D. Pa. May 23, 2011).

sanctioned to a ten-day loss of good time credits, the loss of a sixty days of non-vested good time credits, and was recommended for a disciplinary transfer as a result of this misconduct finding.

While we know this much, the record of these disciplinary proceedings have been misplaced by the Bureau of Prisons. Therefore, we have no idea what evidence supported this charge; what procedural due process protections were provided to Ghertler and what the circumstances of this alleged infraction were.

Indeed, we have no clear idea where Ghertler actually was between September and November 2006. While one would think that this issue would admit of a simple answer, apparently it does not. Despite our repeated requests, the Respondents have been unable to provide any detail on this matter beyond NCIC notations, confirming Ghertler's November 2006 arrest. As for Ghertler, in response to orders from this Court seeking some explanation of this simple factual matter he has refused to answer this question, citing his Fifth Amendment right to remain silent.

While Ghertler has declined to explain what transpired at this halfway house, and the government is seemingly unable to reconstruct these events, having lost virtually all pertinent records, other court records relating to Ghertler's current federal conviction provide some contextual clarity to this matter. In United States v. Ghertler, 605 F.3d 1256, 1260 (11th Cir. 2010), the court of appeals described the offense

conduct underlying Ghertler's current federal conviction in the following terms:

> Between July 2006 and December 2007, and while on supervised release from another fraud conviction in the Southern District of New York, Mr. Ghertler perpetrated a series of remarkably successful frauds on large corporations and law firms. Mr. Ghertler would first research companies and the names of their officers on the internet. He would then telephone the company, identify himself as a high-ranking company official (many times, though not always, the general counsel), and claim that he needed an immediate cash transfer to resolve an urgent matter (usually, the settlement of a fictitious lawsuit). He would then either give verbal instructions regarding the distribution of funds, or fax letters or memoranda over a forged signature authorizing the transfers and providing instructions. At times, the funds were transferred directly to Mr. Ghertler. On other occasions Mr. Ghertler used unwitting couriers to pick up and deliver the proceeds of the frauds. Sometimes he had the funds wired into the accounts of unwitting third parties, who then transferred the cash proceeds to him.

United States v. Ghertler, 605 F.3d 1256, 1260 (11th Cir. 2010).

Thus, in reviewing Ghertler's guilty plea conviction and sentence the court of appeals has indicated that Ghertler was an active participant in a massive fraud scheme, which resulted in an "intended loss . . . between $400,000 and $1 million." United States v. Ghertler, 605 F.3d 1256, 1261 (11th Cir. 2010). The appellate court also stated that this criminal conduct began in July 2006, while Ghertler was completing service of this prior federal fraud sentence and at the very time that he was housed at the Orlando Florida halfway house. Indeed, as the appellate court noted at the time that it sentenced Ghertler the district court "expressly referred to Mr. Ghertler's significant criminal history; *the fact that Mr. Ghertler had continued to*

*make fraudulent calls while incarcerated*; the fact that Mr. Ghertler admitted that he was impulsive and that he "could not stop" offending; and the fact that Mr. Ghertler had skills and talents that could have been put to productive use." United States v. Ghertler, 605 F.3d 1256, 1262 (11th Cir. 2010)(emphasis added.)

While the two months between September and November of 2006 remain cloaked in some confusion, it is undisputed that Ghertler was ultimately located and taken back into federal custody on November 28, 2006.  However, because Ghertler was nearing the end of his term of imprisonment, he was not designated to any specific Bureau of Prisons' institution to serve the remaining months of his sentence.  Instead, Ghertler was held in various holdover facilities until his release less than four months later, on March 14, 2007.

At the time that Ghertler was returned to custody in November 2006, the Bureau of Prisons had a policy, Program Statement 5270.07, governing disciplinary proceedings in escape cases, which provided that:

> [w]hen an inmate escapes or is otherwise absent from custody, the Discipline Hearing Officer shall conduct a hearing in the inmate's absence at the institution in which the inmate was last confined. [W]hen an inmate returns to custody following absence during which sanctions were imposed by the DHO (or the predecessor Institution Discipline Committee (IDC)), the Warden shall have the charges reheard before the Discipline Hearing Officer ordinarily within 60 days after the inmate's arrival at the institution to which the inmate is designated after return to custody, and following appearance before the Unit Discipline Committee at that institution.

Because Ghertler was never designated to any specific institution to complete the final months of his sentence, but was held as a temporary holdover inmate in various jails, he was never afforded the second hearing called for by this policy. Instead, Ghertler simply was released in March 2007 following completion of this sentence without ever receiving the hearing called for by the Bureau of Prisons' own policies.

Ten months later, on January 17, 2008, Ghertler returned to federal custody to face new federal fraud charges, fraud charges involving crimes apparently committed, in part, while Ghertler was housed in this halfway house. As a result of this latest foray into crime, on January 27, 2009, Ghertler was sentenced by the United States District Court for the Middle District of Florida to a 185-month term of imprisonment for wire fraud, a sentence that was later reduced to a 162-month term of imprisonment. See United States v. Ghertler, 605 F.3d 1256, 1260 (11th Cir. 2010). This new criminal conduct by Ghertler, in turn, led to a revocation of his supervised release on his prior federal fraud conviction. Thus, on January 28, 2010, while serving the 162-month term, Ghertler was also sentenced by the Southern District of New York to an 8-month term of imprisonment for violating his supervised release, a sentence which was ordered to run concurrently with to this separate 162-month term for these new criminal charges. Ghertler now has completed the service of this supervised release sentence, and is simply serving his new sentence for his latest fraud offenses. He is

scheduled to be released on this new sentence on November 17, 2019, via good conduct time release.

It is against this factual backdrop that Ghertler has pursued the instant petition, a petition which he has re-cast and re-characterized several times over the course of these proceedings.  In its current form, Ghertler's petition seeks to expunge his 2006 disciplinary citation for escape, a citation which the government candidly acknowledges is no longer defensible on its merits because the entire disciplinary record is and has been hopelessly lost.  Ghertler also appears to seek prospective relief from us, enjoining the Bureau of Prisons in the future from considering certain stubborn criminal facts about Ghertler's misdeeds in 2006 when weighing Ghertler's future prison placements, and assessing whether he should receive favorable consideration for early release from custody.

Unable to defend this case on its merits despite the seeming simplicity of establishing as a factual matter that an escape had occurred, the Respondents argue instead that this petition is entirely moot since Ghertler has completed service of the sentence which gave rise to this citation, and is now apparently serving a new sentence which arose out of criminal misconduct engaged in by Ghertler while he was completing that prior sentence.  Ghertler, in turn, has replied to this mootness argument in a twofold manner: first, noting that at least some prison officials have

themselves apparently conceded that this completely undocumented disciplinary citation should be expunged, (See Doc. 51.); and, second, arguing that the escape disciplinary citation has continuing adverse consequences for him since it may deny him favorable consideration for early release from custody, and may affect his prison placement.

### III. Discussion

Legally, Ghertler's habeas corpus petition is poised between two settled principles, principles which come into conflict on the murky facts of this case.

At the outset, if this case merely presented the straightforward question concerning whether prison officials can overcome an inmate's habeas corpus challenge to a disciplinary citation when the prison admits that it has lost all records of that disciplinary proceeding, rendering its actions effectively unreviewable, the answer would be simple–in this setting, where the prison disciplinary files are irretrievably lost, the inmate would be entitled to habeas corpus relief in the form of an order expunging this undocumented disciplinary citation. Moreover, once the inmate received this very narrow relief and this citation was expunged, this case would be otherwise be moot. See Alvarez v. Kranzel, 3:CV-12-0493, 2012 WL 1867290 (M.D. Pa. May 22, 2012). Therefore, the prisoner would not be entitled to any further prospective relief relating to future discretionary decisions by prison officials. In this

case, the Respondents tacitly acknowledge that they cannot now defend this disciplinary action on its merits because there is no way to effectively assess the merits of this discipline since all records of this disciplinary proceeding are lost. Indeed, in light of this fact it is undisputed that some prison officials have previously recommended expungement of this citation from Ghertler's disciplinary history. (See Doc. 51.)

Nonetheless the Respondents seek to contest this petition by arguing that Ghertler's release, and subsequent re-incarceration, now render this petition moot. The mootness doctrine recognizes a fundamental truth in litigation: "[i]f developments occur during the course of adjudication that eliminate a plaintiff's personal stake in the outcome of a suit or prevent a court from being able to grant the requested relief, the case must be dismissed as moot." Blanciak v. Allegheny Ludlum Corp., 77 F.3d 690, 698-99 (3d Cir. 1996).

There is a constitutional dimension to the mootness doctrine.

> Under Article III of the Constitution, a federal court may adjudicate "only actual, ongoing cases or controversies." Lewis v. Continental Bank Corp., 494 U.S. 472, 477 (1990). "To invoke the jurisdiction of a federal court, a litigant must have suffered, or be threatened with, an actual injury traceable to the defendant and likely to be redressed by a favorable judicial decision." Id. (citing Allen v. Wright, 468 U.S. 737, 750-751 (1984); Valley Forge Christian College v. Americans United for Separation of Church & State, Inc., 454 U.S. 464, 471-473 (1982)). Article III denies the District Court the power to decide questions that

cannot affect the rights of litigants before it, and confines it to resolving live controversies "admitting of specific relief through a decree of a conclusive character, as distinguished from an opinion advising what the law would be upon a hypothetical state of facts." Aetna Life Insurance Co. v. Haworth, 300 U.S. 227, 241 (1937). The case or controversy requirement continues through all stages of federal judicial proceedings, trial and appellate, and requires that parties have a personal stake in the outcome. Lewis, 494 U.S. at 477-478. "This means that, throughout the litigation, the plaintiff 'must have suffered, or be threatened with, an actual injury traceable to the defendant and likely to be redressed by a favorable judicial decision.' " Spencer, 523 U.S. at 7 (quoting Lewis, 494 U.S. at 477). Incarceration satisfies the case or controversy requirement; it is a concrete injury caused by a conviction and is likely to be redressed by invalidation of the conviction. Id. Once a sentence has expired, however, some continuing injury, also referred to as a collateral consequence, must exist for the action to continue. Id.

Burkey v. Marberry, 556 F.3d 142, 147 (3d. Cir. 2009)(dismissing habeas petition as moot).

In the context of habeas corpus petitions mootness questions, therefore, often turn on straightforward factual issues. Thus:

[A] petition for habeas corpus relief generally becomes moot when a prisoner is released from custody before the court has addressed the merits of the petition. Lane v. Williams, 455 U.S. 624, 631(1982). This general principle derives from the case or controversy requirement of Article III of the Constitution, which "subsists through all stages of federal judicial proceedings, trial and appellate ... the parties must continue to have a personal stake in the outcome of the lawsuit."Lewis v. Cont'l Bank Corp., 494 U.S. 472, 477-78 (1990) (internal citations and quotations omitted). In other words, throughout the litigation, the plaintiff "must have suffered, or be threatened with, an actual injury traceable to the defendant and likely to be redressed by a favorable judicial decision." Id. at 477(citations omitted).

DeFoy v. McCullough, 393 F.3d 439, 441-442 (3d Cir. 2005).

Applying this principle, some courts have dismissed habeas petitions as moot where it is shown that the prisoner-petitioner has been released from the sentence which he is challenging, reasoning that when that sentence has been fully discharged a habeas petition attacking the sentence is no longer subject to redress in the courts. See, e.g., Marine v. Quintana, 347 F. App'x 736 (3d Cir. 2009); Scott v. Schuylkill, FCI, 298 F. App'x 202 (3d Cir. 2008); Scott v. Holt, 297 F. App'x 154 (3d Cir. 2008); Williams v. Sherman, 214 F. App'x 264 (3d Cir. 2007); Razzoli v. FCI Allenwood, 200 F. App'x 166 (3d Cir. 2006).  This principle has been specifically applied to petitions, like the petition advanced here by Ghertler, which seek to collaterally challenge the outcome of disciplinary prison proceedings that occurred in the course of a sentence which has now been fully served by the prisoner-petitioner.  Marine v. Quintana, supra; Scott v. Schuylkill, supra; Scott v. Holt, supra.

However, in assessing mootness claims made in the specific factual context of prison disciplinary decisions involving sentences which have concluded, courts do not follow a completely categorical approach to this issue, and have not held that a prisoner's subsequent release always and automatically compels dismissal of a habeas corpus petition challenging some disciplinary action as moot.  Instead, courts have assessed such claims by examining on a case-by-case basis whether there are

13

continuing and concrete collateral consequences that flow from the disciplinary decision and survive the expiration of the prisoner's original sentence.

Several themes have emerged from this case-by-case assessment of the potential collateral consequences which may flow from past disciplinary decisions. At the outset, at least one court has suggested that when a disciplined inmate is re-incarcerated, that past discipline may follow the prisoner in his new confinement in ways which give rise to some continuing collateral consequences for the inmate. Leonard v. Nix, 55 F.3d 370, 373 (8th Cir. 1995) ("Upon his return to [custody], [petitioner's] inmate status is marked by the previous rules violation, and if he commits any further infractions he faces more severe treatment because of this prior disciplinary action. Accordingly, [this] petition for a writ of habeas corpus is not moot . . . . ") However, in undertaking this assessment courts generally "decline to apply the presumption of collateral consequences to prison disciplinary proceedings. Cf. Diaz v. Duckworth, 143 F.3d 345, 346 (7th Cir.1998) (reasoning that Spencer had confined the presumption to convictions and so the court's extension of the presumption to prison disciplinary proceedings was no longer good law)." Wilson v. Terhune, 319 F.3d 477, 481 (9th Cir. 2003). Furthermore, in making this case-by-case determination regarding whether a particular inmate continues to face collateral consequences as a result of some disciplinary action related to a sentence which has

now concluded courts have applied an exacting standard and have held that: "The mere possibility that his sentence 'may' have been shortened had [the petitioner] been eligible to receive discretionary credits does not revive his case because only decisions that 'inevitably affect the duration of his sentence,' Sandin v. Conner, 515 U.S. 472, 487, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995); Higgason v. Farley, 83 F.3d 807, 809 (7th Cir.1996), are actionable." Herbst v. Sevier, 430 F. App'x 530, 531 (7th Cir. 2011). Applying these benchmarks courts have held that a number of potential future consequences, such as future classification decisions, future inmate employment, and potential availability of discretionary early release programs are not sufficiently concrete collateral consequences to define a live dispute. See e.g., Herbst v. Sevier, 430 F. App'x 530, 531 (7th Cir. 2011); Scott v. Schuykill FCI, 298 F. App'x 202, 204 (3d Cir. 2008)(petitioner's assertion that his discipline for "fighting with another person" may adversely affect his future classification is too speculative to demonstrate collateral consequences); Medberry v. Crosby, 351 F.3d 1049, 1053 (11th Cir. 2003); Wilson v. Terhune, 319 F.3d 477, 481 (9th Cir. 2003). Further, when this issue has been considered in the context of a challenge to prison discipline arising out of an alleged escape, at least one court has noted a somewhat pointless and pyrrhic aspect to a habeas challenge to past discipline based upon the notion that the past discipline may adversely affect future prison placement, discipline, and pre-release decision-

making, observing that for the inmate disciplined for escape, it is the discretionary consideration of the *fact* of the escape, rather than any disciplinary action, which has adverse consequences for the prisoner in the future. Wilson v. Terhune, 319 F.3d 477, 482 (9th Cir. 2003) ("Wilson has not challenged the fact that he escaped. This fact is more likely to influence Wilson's parole prospects . . . .")

Weighing these competing legal tenets in the factual context of this case, we have substantial doubt that the future consequences which Ghertler faces are sufficiently concrete to overcome a mootness challenge. We also believe that there is substantial reasons to believe that setting aside this disciplinary infraction will not alter the discretionary calculus undertaken by prison officials as they consider Ghertler's undisputed misconduct while serving his last federal sentence when deciding whether Ghertler is entitled to favorable early release in his current case. Furthermore, consideration of these facts is entirely appropriate. Indeed, it is the right, responsibility and the duty of the Bureau of Prisons to take such matters into account when assessing how to exercise discretion in a host of placement and pre-release decisions. Simply put, the stark reality that in the past Ghertler "had continued to make fraudulent calls while incarcerated," United States v. Ghertler, 605 F.3d 1256, 1262 (11th Cir. 2010), should, and likely will, adversely affect release decisions that will be made as the petitioner approaches his 2019 release date. There is nothing

inappropriate about this exercise of discretion, and this Court should decline any invitation by Ghertler to have us forbid the Bureau of Prisons from considering the fact of the petitioner's past misconduct in making future placement and release decisions.

Nonetheless, acting out of an abundance of caution and recognizing that this specific disciplinary decision cannot now be justified or defended due to an administrative oversight by the Bureau of Prisons, the loss of the entire disciplinary record, we believe that those prison officials who in the past have recommended expungement of this citation are correct, and the citation should be expunged. See Alvarez v. Kranzel, 3:CV-12-0493, 2012 WL 1867290 (M.D. Pa. May 22, 2012). In all other respects the petition should be dismissed as moot, with the understanding that the Bureau of Prisons may consider all other relevant facts, including any facts relating to the alleged disappearance of Ghertler from the halfway house in September 2006, Ghertler's subsequent arrest and re-incarceration in November 2006, and other misconduct by Ghertler at the time of his halfway house placement, United States v. Ghertler, 605 F.3d 1256, 1262 (11th Cir. 2010), when making future placement, and discretionary release decisions relating to the Petitioner.

### IV. <u>Recommendation</u>

Accordingly, for the foregoing reasons, upon consideration of this Petition for Writ of Habeas Corpus, IT IS RECOMMENDED that the Petition be GRANTED in part, in that the disciplinary citation brought against Ghertler for escape should be expunged since there is no factual record which permits an assessment of that citation. In all other respects the petition should be DISMISSED AS MOOT, with the understanding that the Bureau of Prisons may consider all other relevant facts, including any facts relating to the alleged disappearance of Ghertler from the halfway house in September 2006, Ghertler's subsequent arrest and re-incarceration in November 2006, and other misconduct by Ghertler at the time of his halfway house placement, <u>United States v. Ghertler</u>, 605 F.3d 1256, 1262 (11th Cir. 2010), when making future placement, and discretionary release decisions relating to the Petitioner, and a certificate of appealability should not issue.

The parties are further placed on notice that pursuant to Local Rule 72.3:

Any party may object to a magistrate judge's proposed findings, recommendations or report addressing a motion or matter described in 28 U.S.C. § 636 (b)(1)(B) or making a recommendation for the disposition of a prisoner case or a habeas corpus petition within fourteen (14) days after being served with a copy thereof. Such party shall file with the clerk of court, and serve on the magistrate judge and all parties, written objections which shall specifically identify the portions of the proposed findings, recommendations or report to which objection is made and the basis for such objections. The briefing requirements set forth in Local Rule 72.2 shall apply. A judge shall make a de novo determination of

those portions of the report or specified proposed findings or recommendations to which objection is made and may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge, however, need conduct a new hearing only in his or her discretion or where required by law, and may consider the record developed before the magistrate judge, making his or her own determination on the basis of that record. The judge may also receive further evidence, recall witnesses or recommit the matter to the magistrate judge with instructions.

Submitted this 23d day of June, 2014.

                                                ***S/Martin C. Carlson***
                                                Martin C. Carlson
                                                United States Magistrate Judge